KILPATRICK TOWNSEND & STOCKTON LLP
ROGER L. COOK (State Bar No. 55208)
ROBERT D. TADLOCK (State Bar No. 238479)
SARA B. GIARDINA (State Bar No. 278954)
Eighth Floor, Two Embarcadero Center
San Francisco, CA  94111
Telephone:415 576 0200
Facsimile: 415 576 0300
E-mail:     rcook@kilpatricktownsend.com
            rtadlock@kilpatricktownsend.com
            sgiardina@kilpatricktownsend.com

Attorneys for Plaintiff
SIDENSE CORP.

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SIDENSE CORP., a Canadian corporation, <br><br> Plaintiff, <br><br> v. <br><br> KILOPASS TECHNOLOGY, INC., a California corporation, <br><br> Defendant. | Case No. 14-2238 <br><br> **COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION** <br><br> **DEMAND FOR JURY TRIAL PURSUANT TO FED. R. CIV. P. 38(b)** |



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

Plaintiff Sidense Corp. ("Sidense"), for its Complaint, complains of defendant Kilopass Technology, Inc. ("Kilopass" or "defendant") as follows:

## NATURE OF THE ACTION

1.      Sidense brings this action to remedy the profound harm it has sustained as a result of Kilopass' predatory actions, perpetrated in the courtroom, the United States Patent and Trademark Office, and the marketplace, in violation of Federal antitrust law, with the goal of eliminating Sidense from the market for CMOS embeddable antifuse one-time programmable (OTP) nonvolatile memory (NVM) and thereby preserving Kilopass' dominance of that market.

2.      As the Federal Circuit explained, "Memory cells use transistors to store information.  NVM memory consists of memory devices that retain their information (or state) when power is removed." Sidense and Kilopass are competitors who develop antifuse NVM IP technology and license it to customers who use those designs to build CMOS integrated circuits with embedded "antifuse" NVM arrays that include rows and columns of memory cells. "Antifuse" programming involves a permanent structural change made by subjecting an individual memory cell to programming voltage, which melts and then recrystallizes to form a conductive channel. Once programmed, an antifuse memory cell cannot be un-programmed.

3.      Sidense was founded in 2004, and by 2010 had become increasingly recognized as a leading innovator in the emerging market for OTP NVM IP. Sidense's 1T-Fuse™ provides small footprint, low power, fast access times, high density, and high reliability OTP NVM IP. Sidense licenses its NVM technology to its customers – chip designers and chipmakers who employ the Sidense NVM technology in a variety of integrated circuits used in consumer electronics products such as smartphones and set top boxes.

4.      Sidense delivers its NVM technology to customers in the form of a Macro Integration Kit that includes datasheets, application notes, integration



guidelines, and all technical models and files needed to integrate a particular Sidense memory array into the customer's integrated circuit. Sidense and the customer transact a license agreement on terms that include a license fee and a royalty and the license could be for single use, multi-use, unlimited-use or subscription.

5. Kilopass dominates the market for CMOS embeddable antifuse OTP NVM IP. In 2005, almost immediately after seeing publication of Sidense's first international patent application, Kilopass began plotting to block Sidense's progress with Kilopass' patent portfolio. However, Kilopass' outside patent attorney at the law firm Perkins Coie advised Kilopass that Sidense does "NOT infringe [Kilopass'] claims literally" and "that [Sidense has] redesigned [its] memory cell to avoid infringement of our patents. Or at least make our case much tougher."

6. Nonetheless, in 2008, Kilopass hired a new CEO who, on information and belief, set Kilopass on a path to use the litigation process itself, rather than the outcome of that process on the merits, to obtain a monopoly in the CMOS embeddable antifuse OTP NVM IP market by destroying Sidense as a competitor.

7. Undeterred by Kilopass' patent counsel's negative infringement advice, Kilopass then filed a lawsuit against Sidense alleging that it infringed three Kilopass patents. Kilopass' suit also alleged various business torts claiming Sidense had misrepresented itself to customers. Simultaneously, Kilopass filed a petition with the USPTO to invalidate what it described in press releases as Sidense's "key" patent, even though Sidense had never asserted that patent against Kilopass.

8. On information and belief, Kilopass intended these baseless lawsuits and proceedings to chill competition in the market by preventing Sidense from competing and by stifling entry and innovation from other competitors. In addition to these proceedings, Kilopass launched a negative PR campaign designed to threaten, bully, and spread fear among customers to prevent them from doing business with Sidense.

9. Kilopass' legal challenges have all failed. Sidense defeated the patent infringement lawsuit on summary judgment, which the Federal Circuit affirmed in a



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION       - 2 -

one-word opinion. Kilopass' inconsistent positions and shifting theories demonstrated the baseless nature of its claims. Indeed, Kilopass continued pursuing the litigation even after the USPTO patent examiner found two of the three asserted patents invalid; and Kilopass was only able to keep the third patent alive in the USPTO by taking a position wholly inconsistent with what it had told the district court, something the district court described as "gamesmanship." Kilopass' business tort allegations similarly failed, with Kilopass pursuing the claims for more than two years, refusing to dismiss them with prejudice even though it had no supporting evidence. Kilopass moved to dismiss the business tort claims without prejudice on the eve of trial and, when the district court refused to dismiss without prejudice at such a late date, Kilopass agreed to an unconditional dismissal of its business tort claims with prejudice, but then extended the dispute by appealing the business tort claims to the Federal Circuit. Moreover, Kilopass' reexamination attempt to extinguish Sidense's patent has failed, although proceedings continue with no end in sight.

10.    On information and belief, Kilopass knew that its legal challenges were baseless, and that the primary purpose of each challenge was not the outcome on the merits, but the harassment and burden on Sidense caused by the litigation process itself in an attempt to interfere directly with Sidense's business relationships.

11.    During the pendency of these various proceedings, Kilopass also embarked on a marketplace campaign spreading fear, uncertainty, and doubt ("FUD") among Sidense's customers and potential customers. Kilopass' CEO and other executives told the market that Kilopass would sue Sidense customers for patent infringement, and that Kilopass was in the final stages of preparing a complaint to the International Trade Commission (ITC) to prevent import of chips containing Sidense NVM technology. Kilopass also began a public campaign offering Sidense's customers a "Patent Coverage License" for Kilopass patents, issuing press releases warning that no such license would be available after Kilopass prevailed in its lawsuit against Sidense.  Kilopass' CEO and other executives also contacted Sidense's



1   customers, baselessly warning them that Sidense was not financially viable and

2   would soon be bankrupt.

3       12.     Kilopass' overall scheme to destroy Sidense and monopolize the antifuse

4   market almost worked. Sidense, which had been growing revenue each year,

5   suddenly saw its growth stall and stay stalled for three years while Kilopass kept its

6   baseless litigation and FUD campaign alive. Not only did Kilopass scare customers

7   away from doing business with Sidense, Kilopass' onslaught forced Sidense to divert

8   millions of dollars away from its marketplace and technological competition with

9   Kilopass to ward off the litigation and FUD campaign of its monopolistic rival.

10  Sidense brings this action to hold Kilopass accountable for its unlawful and

11  destructive attempt to extinguish its only significant antifuse competitor in pursuit of

12  a monopoly of the CMOS embeddable antifuse OTP NVM IP market.

13

14                          **THE PARTIES**

15      13.     Sidense is a Canadian Corporation with its principal place of business at

16  84 Hines Road, Suite 260, Ottawa, Ontario, Canada, K2K 3G3. Sidense's business is

17  devoted to the design and licensing of CMOS embeddable antifuse OTP NVM IP. At

18  no time has Sidense's share of this market exceeded about 30%.

19      14.     Kilopass is a California Corporation with its principal place of business

20  at 3333 Octavius Drive, Santa Clara, California 95054. Like Sidense, Kilopass also

21  designs and licenses CMOS embeddable antifuse OTP NVM IP.  Since entering the

22  market after its founding in 2002, Kilopass' share of this market has been between

23  about 70% and 100%.

24

25                  **JURISDICTION AND VENUE**

26      15.     This Complaint states claims for violation of the federal antitrust laws.

27  This Court has subject matter jurisdiction over these claims under 15 U.S.C. §§ 15

28  and 26 and 28 U.S.C. §§ 1331 and 1337.



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 4 -

16.     At all times relevant to these claims, Kilopass has engaged in and affected interstate commerce and foreign import commerce all within the meaning of the Sherman Act (15 U.S.C. § 2).

17.     The violations of law described in this Complaint have been and are being carried out in the United States and in this judicial district. This Court has personal jurisdiction over Kilopass because it resides in this district. Venue in this judicial district is proper under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(c) and (d) because a substantial part of the events giving rise to the claims asserted arose in this district.

18.     **Intradistrict Assignment**.  This case is appropriately assigned to the San Francisco division because many of the facts alleged herein occurred in this division.

## BACKGROUND FACTS

### Kilopass' Attorneys Advised that Sidense Does Not Infringe Kilopass' Patents

19.     In 2005, Jack Peng, Kilopass' founder and the inventor on the three patents Kilopass asserted against Sidense, discovered an international patent application filed by Sidense relating to Sidense's NVM design. This application had two embodiments, one of which had two diffusions and one of which had but a single diffusion. This was Kilopass' first awareness of Sidense. Mr. Peng sent the patent application to Kilopass' CEO, CTO, and its outside patent attorney at the law firm Perkins Coie. Mr. Peng explained that Kilopass "did not file [a] dedicated patent" on the [single diffusion] design in Sidense's patent application, but that Kilopass "should [have] filed this patent [a] long time ago even though we were very busy." Mr. Peng explained, "Why we did not implement this cell in our product, [was] because this split gate [c]ell is not self-aligned, so their practical cell size will be larger than [o]ur 1.5T cell."

20.    In other words, Mr. Peng informed Kilopass that he had not patented a Sidense-type (single-diffusion) cell and because it could not be self-aligned, Sidense's single diffusion memory cell was larger than Kilopass' commercial 1.5T memory cell. "Self-alignment" is a well-known semiconductor manufacturing technique in which the polysilicon gate of a semiconductor device serves as a mask in order to make the device small.

21.    Mr. Peng's statements to Kilopass' CEO, CTO, and patent attorney were critical to Kilopass' pursuit of Sidense. Kilopass' patents specifically stated that the claimed memory cell, which required two diffusions, i.e. "first and second doped semiconductor regions," was *smaller* than Kilopass' 1.5T commercial memory cell, whereas the statements by Mr. Peng, Kilopass' founder and the named inventor on all three patents asserted against Sidense, showed that Sidense's single diffusion memory cell was substantially *larger* than Kilopass' 1.5T memory cell. This, in turn, meant that Sidense's single diffusion memory cell was *substantially larger* than Kilopass' claimed two-diffusion memory cell claimed in Kilopass' patents.

22.    This information was critical to Kilopass' desire to assert its patents against Sidense because, as Kilopass' attorneys advised, infringement by equivalence allows only an insubstantial difference between what the patent claims cover and what the patent owner may wish to accuse.

23.    Shortly after conversing with Mr. Peng in 2005, Kilopass' patent attorney contacted Sidense to suggest that Sidense might be infringing Kilopass' patents. Sidense promptly responded with three reasons why its memory cell did not infringe, including that Sidense's memory cell did not have "first and second doped semiconductor regions." After reviewing Sidense's response, Kilopass' patent attorney informed Mr. Peng and Kilopass' CEO and CTO that if Sidense had designed its memory cell as indicated "they would NOT infringe our claims literally" and that Kilopass "would have to go through a 'reissue' proceeding in the patent office that may take 2 years in order to modify our claims to include the situation



1   where there is no first doped region. . . .  The most crucial bit of information we need

2   to find out is the design of their memory cell." In other words, the most "crucial bit of

3   information" was whether Sidense's memory cell had one diffusion or two.

4       24.   More than a year later, in June 2007, Kilopass obtained a diagram of

5   Sidense's commercial NVM design, which confirmed that Sidense had designed its

6   memory cell with only a single diffusion, just as Sidense explained in its response to

7   Kilopass' letter. After reviewing Sidense's design, Kilopass' same outside patent

8   attorney sent an e-mail to Kilopass officials stating: "My preliminary review of all the

9   Sidense materials indicates that they have redesigned their memory cell to avoid

10   infringement of our patents.  Or at least make our case much tougher."

11      25.   Despite this advice from its patent attorney, Kilopass began shopping for

12   patent litigation counsel. Kilopass interviewed patent litigators at the law firm

13   Morrison and Foerster ("MoFo"). However, when Kilopass learned that the MoFo

14   lawyers had then begun a thorough evaluation as to whether there was actual

15   infringement, Kilopass abruptly told the lawyers to stop work. To justify their bill for

16   services, the MoFo lawyers sent Kilopass a "preliminary infringement chart."

17   However, this chart did not address how Kilopass could prevail despite the fact that

18   Sidense's design resulted in "larger effective cell size" according to Mr. Peng, the

19   named inventor on Kilopass' patents. Moreover, there is no evidence that Kilopass

20   ever gave this critical piece of information to MoFo. Also, the MoFo claim chart,

21   unsupported by an expert opinion, did not include any credible explanation of how

22   the alleged replacement for the missing diffusion (STI, an insulator) could be

23   equivalent to the missing diffusion (a conductor). The MoFo patent litigators' advice

24   as to infringement by equivalence, which was based upon a technical distinction, was

25   not competent advice upon which Kilopass could have reasonably relied, as

26   evidenced by the fact that Kilopass' technical expert for trial repudiated it.

27

28

**Kilopass Sued Sidense For Patent Infringement Without
Even Seeking Or Receiving Advice As To How The
Single-Diffusion Cell, Despite Being Substantially
Larger, Could Infringe By Equivalence**

26.     On information and belief, before filing suit, no Kilopass lawyer or technical advisor ever explained how Sidense's single diffusion memory cell could infringe Kilopass' two-diffusion memory cell patents by equivalence despite being substantially larger than the claimed memory cell; or how the alleged replacement for the missing diffusion (STI, an insulator) could be equivalent to the missing diffusion (a conductor).

27.     However, MoFo did tell Kilopass that infringement by equivalence required an insubstantial difference between what the patent claimed and what Kilopass wished to accuse of infringement.

**On Information and Belief, Faced with Increasing
Competition from Sidense, Kilopass Undertook to
Destroy Sidense, its Only Significant Competitor,
To Monopolize the Relevant Market**

28.     In early 2008, Kilopass encountered stiff competition from new rival Sidense in bidding for a $10 million customer order for OTP NVM IP.

29.     On information and belief, Kilopass and Sidense were at that time the only companies offering antifuse OTP NVM IP.

30.     Antifuse has advantages over other types of OTP NVM IP, such as in certain smartphone and set top box applications, including that it is field programmable (i.e. can be programmed in the field, not just in the factory) and, as a practical matter, it is impossible to reverse engineer to learn the data programmed in it.

31.     The prospective order dwarfed the Kilopass and Sidense annual revenues at the time.

32.     On information and belief, Kilopass was aware that Sidense's technology had significant advantages over Kilopass' technology, especially in the smaller area of the integrated circuit (chip) that a given Sidense memory array occupied, i.e. the



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 8 -

so-called "die area," compared to the much larger die area of a comparable Kilopass memory array, and this had put Kilopass on the defensive.

33. On information and belief, to offset Sidense's technical advantage, Kilopass told the prospective customer that Kilopass had built and tested the Sidense technology and found it could not be commercially viable. However, on information and belief, Kilopass never conducted tests that might lead to such a conclusion.

34. Although Peng understood that the single-diffusion memory cell would be larger than Kilopass' 1.5 T memory cell, he failed to appreciate that the overall size of a memory array incorporating those larger memory cells would be much smaller than a comparable Kilopass memory array using 1.5T memory cells since those memory arrays include far less peripheral decoder circuitry. Peng also failed to appreciate that, while a single-diffusion memory cell array could be not be built without violating design rules intended to prevent semiconductor device failures, the design rule variation needed by the Sidense device was not subject to the type of failure that the design rule was intended to prevent. These two insights by Sidense, overlooked by Kilopass, have given Sidense technological superiority over Kilopass in the marketplace.

35. On information and belief, because Sidense's 2008 emergence as a strong new competitor deeply troubled Kilopass, it began searching for a new CEO who could meet the Sidense challenge.

36. In late 2008, Kilopass found a man with a plan for combatting Sidense – Charlie Cheng – and hired him as its new CEO. Mr. Cheng had prior experience in the embeddable IP industry at startup Lexra whose embeddable microprocessor core IP technology competed with IP offerings from its larger, more well-established competitor, MIPS. MIPS had sued Lexra for patent infringement and publicized that lawsuit in the marketplace. On information and belief, customers became concerned about the lawsuit, and stopped purchasing Lexra's product. On information and belief, Lexra could not overcome the increased expenses of the lawsuit and reduced



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION       - 9 -

revenues, forcing Lexra to settle the litigation on MIPS' terms and change its business. On information and belief, as a result of the settlement, Lexra went out of business.

37.    On information and belief, Mr. Cheng saw how he could employ a MIPS-like strategy to destroy Sidense with patent infringement litigation even without a meritorious patent infringement claim. On information and belief, Kilopass hired Mr. Cheng to carry out such a plan against Sidense, and he did so.

### Kilopass Weaponizes the Litigation Process

#### *Kilopass Files a Sham Patent Infringement Lawsuit Against Sidense*

38.    Kilopass laid in wait until Sidense was competing for the account of a major customer (Intel) and just had announced raising $5 million in second round venture capital funding.

39.    Then, on May 14, 2010, despite the repeated advice from its patent counsel that Sidense did not literally infringe and had "redesigned their memory cell to avoid infringement of [Kilopass'] patents," Kilopass filed a complaint against Sidense asserting that Sidense infringed U.S. Patent No. 6,940,751 ("the '751 patent").

40.    In June, 2010, Kilopass amended its complaint to add claims for infringement of U.S. Patent Nos. 6, 777,757 and 6,856,540 ("the '757 and '540 patents"), and claims for defamation/trade libel, false advertising under the Lanham Act, intentional interference with prospective economic advantage, and unfair competition under California Business and Professions Code § 17200.

41.    Even though Kilopass knew or should have known that Sidense did not infringe the '751, '757 and '540 patents, it prosecuted and publicized these infringement claims until the Federal Circuit resolved them three years later.

42.    Kilopass plainly lacked probable cause for its assertion of literal infringement. Years before filing suit, Kilopass learned that Sidense's memory cell



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 10 -

had only a single diffusion rather than "first and second doped semiconductor regions" as required by the patent claims and, thus, that Sidense did not literally infringe.

43.     Kilopass also plainly lacked probable cause for the assertion of infringement by equivalence since it knew or should have known that Sidense did not infringe the Kilopass patent under the doctrine of equivalents. Peng had told Kilopass' CEO, CTO and patent attorney that a single-diffusion memory cell like Sidense's was substantially larger than the two-diffusion memory cell claimed in the Kilopass patents; and MoFo had told Kilopass that infringement by equivalence permitted only an insubstantial difference. On information and belief, Kilopass was well aware of this size difference when it filed its infringement claims. Kilopass had no probable cause to assert infringement by equivalence for the further reason that, on information and belief, it never sought or received, let alone reasonably relied upon, competent advice as to how there could be infringement despite this size difference; and despite the irrefutable difference between an insulator and a conductor. Hence, Kilopass' patent infringement lawsuit was objectively baseless.

44.     On information and belief, the purpose of Kilopass' patent infringement suit was not to win on the merits but to interfere directly with Sidense's business relationships.

45.     The district court granted Sidense summary judgment of non-infringement, reasoning that Kilopass ignored "numerous differences" between the asserted claims and the accused Sidense products. Even though the lawsuit lacked merit, it succeeded in many respects. It forced Kilopass' only significant competitor Sidense to divert substantial amounts of finite time, money and attention away from marketplace competition to defend the lawsuit and respond to customer concerns engendered by Kilopass' aggressive lawsuit publicity. It also scared off customers for Sidense's technology, and scared away potential new competitors.

### *Kilopass Files a Sham Petition for Reexamination of Sidense's "Key" '855 Patent*

46.     On May 21, 2010, Kilopass filed a petition asking the USPTO to re-examine Sidense's U.S. Patent No. 7,402,855 patent ("the '855 patent"), asserting that all of the '855 patent claims were invalid.

47.     This was unusual, since Sidense had never accused Kilopass of infringing the '855 patent and, on information and belief, Kilopass had no plan to copy the Sidense design.

48.     The patent examiner found Kilopass' '855 reexamination proceedings meritless, refusing to invalidate or even narrow the '855 patent claims, and instead awarded Sidense seven additional patent claims.

49.     Kilopass appealed the examiner's decision to the USPTO Board of Appeals, who reversed the patent examiner's decision, whereupon Sidense requested the patent examiner to reopen prosecution of the '855 patent to consider amendments to its claims. Sidense amended its claims to include *inter alia* limitations directed to the wordline/bit line configuration of Sidense's memory array, which was opposite from and distinctively different from, the Kilopass wordline/bit line configuration. Kilopass again opposed. When the patent examiner found the amended claims to be patentable, Kilopass once again opposed this allowance, and again sent the matter to the USPTO Board of Appeals, where the matter remains pending.

50.     Consequently, Kilopass has been prosecuting USPTO reexamination proceedings of Sidense's '855 patent for four years, and the end is still not in sight.

51.     Kilopass' '855 reexamination was no more than a pretext for harming Sidense since Sidense had never accused Kilopass of infringing the '855 patent and, on information and belief, Kilopass had no intention of commercializing a memory cell which might be covered by the '855 patent.

52.     The cost of achieving any remedy Kilopass might ultimately obtain in the '855 reexamination proceedings far outweighs the benefit of that remedy to



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 12 -

Kilopass, such that Kilopass would not have pursued it without the benefit of collateral injuries imposed on Sidense by the reexamination process itself.

### Kilopass Files a Sham Business Tort Claim Against Sidense

53.     In June 2010, Kilopass amended its patent infringement complaint to assert business tort claims for defamation, interference, false advertising and unfair competition.

54.     However, like Kilopass' patent infringement claims, these business tort claims were both baseless and vexatious, since Kilopass had no evidence to support them.

55.     Kilopass' business torts claims fared no better than Kilopass' patent infringement claims.

56.     The district court dismissed Kilopass' defamation/trade libel claim for failure to state a claim with leave to amend. Kilopass never filed an amended complaint addressing the deficiencies in this claim.

57.     Kilopass never had evidence to support the remaining business tort claims and yet fought to keep those claims alive throughout discovery, pretrial, and even through appeal.

58.     Consequently, Sidense was forced to divert even more of its finite time, money and attention away from competitive activities to contend with Kilopass' baseless business tort claims.

### Kilopass Further Weaponizes The Litigation Process By Rejecting Proposals To Make The Patent Lawsuit More Efficient

59.     Kilopass further weaponized the litigation process by rejecting reasonable proposals for streamlining the litigation in favor of the most expensive and least efficient alternatives. For example, at the outset of the patent infringement lawsuit, Sidense moved to stay the litigation until the outcome of Sidense's petitions



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 13 -

1    for reexamination of the three patents in suit. Kilopass opposed the stay so that the

2    reexaminations and district court litigation proceeded in parallel.

3         60.    A stay of the litigation could have, and almost certainly would have,

4    obviated the need for Sidense to expend millions of dollars in patent infringement

5    litigation costs. This is because, in March 2012 and November 2011, the patent

6    examiner ruled that two of Kilopass' asserted patents, the '757 and '540 patents, are

7    invalid; and then, on January 6, 2012, Kilopass disavowed the '751 patent's coverage

8    of a claimed wordline/bitline configuration shared by a prior art patent and Sidense's

9    accused memory cell, thereby precluding Sidense's infringement of the '751 patent.

10        61.    When Sidense informed the district court that Kilopass was taking

11   contrary positions as to the wordline/bitline configuration coverage of its '751 patent

12   in the re-examination and litigation, the district court found that Kilopass had

13   disavowed the '751 patent claim scope necessary to cover Sidense's accused memory

14   cells. Kilopass then attempted to introduce a new "fact" in the reexamination record

15   by attempting to retract its disavowal of the '751 patent's coverage in a request for

16   the district court to reconsider its ruling on disavowal. In rejecting that ploy, the

17   district court said "the rule [permitting reconsideration] does not apply where the

18   'new material fact' is merely a party's attempt to undo a strategic position for which

19   it has been penalized."  The district court characterized Kilopass' conduct as

20   "gamesmanship."

21        62.    Nonetheless, by rejecting Sidense's threshold request to stay the

22   litigation to await the outcome of USPTO proceedings, Kilopass succeeded in forcing

23   Sidense to incur millions of dollars in unnecessary litigation costs, and unnecessarily

24   prolonged the litigation that had been scaring off customers and potential new

25   competitors alike.

26        63.    Moreover, rather than stay, or even scale back its infringement case after

27   the patent examiner had ruled that the '757 and '540 patents are invalid, and after its

28   disavowal of the '751 patent's coverage of the Sidense memory cell, Kilopass



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION        - 14 -

1  continued to press its lawsuit forward. This forced Sidense to incur millions of dollars

2  in unnecessary litigation costs, and unnecessarily prolonged the litigation that was

3  scaring off customers and potential new competitors alike.

4       64.    Similarly, rather than abandon its lawsuit in late 2011 after Sidense

5  served contention interrogatory answers explaining in detail why it was impossible

6  for Sidense's memory cell to infringe of any of Kilopass' asserted patent claims,

7  Kilopass instead abandoned its infringement theory and futilely pursued an even

8  more outlandish alternate infringement theory without court permission. When

9  Kilopass belatedly announced its new theory of equivalence more than two years

10  after filing the complaint, the district court rejected it in strong terms, noting that "[t]o

11  avoid summary judgment [], Kilopass has introduced a new theory," which the court

12  rejected because, *inter alia*, it would have rendered the court's disavowal decision

13  "meaningless." The district court said, "Kilopass' assertion of a new theory of

14  equivalence is particularly inappropriate in light of evidence that **Kilopass has**

15  **known for many years that Sidense does not literally infringe its patents**." The

16  district court then granted Sidense's motion for summary judgment on three separate

17  grounds applicable to all claims of all three patents.

18       65.    Similarly, rather than abandon its futile infringement suit following the

19  district court's entry of summary judgment on multiple factual and procedural

20  grounds, Kilopass baselessly filed an appeal on the summary judgment ruling,

21  dragging out the litigation for another year, claiming the district court made errors in

22  its ruling. The Federal Circuit did not agree, issuing a unanimous one word opinion –

23  "Affirmed."

24       66.    In these ways and others, Kilopass prolonged the litigation and

25  succeeded in forcing Sidense to run up millions of dollars in unnecessary litigation

26  costs.

27

28

COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION    - 15 -

*Kilopass' Publicity Campaign to Threaten*
*Sidense's Customers*

67.     During the proceedings mentioned herein, Kilopass also engaged in a marketplace FUD campaign to further interfere directly with Sidense's business relationships.

*Kilopass' Publicity That Sidense's '855 Patent Was*
*Invalid So That Sidense Could Not Legitimately License*
*Its Technology Were Blatantly False*

68.     Kilopass publicized the '855 reexamination in press releases falsely representing that Sidense's '855 patent claims were "invalid" and, therefore, that Sidense could not "legitimately license its technology."

69.     These publicized statements were blatantly false. The USPTO had never decided that the '855 patent claims are invalid. Moreover, Sidense had other patents that covered its technology. In addition, there is no requirement that a company have patents on its technology in order to legitimately license that technology.

*Kilopass Publicized Its Patent and Business Tort*
*Lawsuit Even Though It Knew That Sidense Did Not*
*Infringe Its Patents and Had No Knowledge of Any*
*Tortious Conduct by Sidense*

70.     During the next few years of litigation, Kilopass continued to publicize its patent infringement and business tort claims in the marketplace.

71.     To thwart competition by making it falsely appear as though its patents cover the entire universe of 1T antifuse memory cell structures, Kilopass' website has long depicted a half-transistor (i.e. single diffusion) memory cell (see below), which it represents as covered by its patents, even though Kilopass has long known that its inventor did not patent a single diffusion memory cell, and that a single diffusion memory cell does not infringe Kilopass' patents literally or by equivalence, and falsely states that such a single memory cell has "defects due to multiple implants" and that this memory cell is "not standard cmos."





(Diagram: 1T not standard cmos)

72.    Also, shortly after filing suit in May 2010, Kilopass began threatening Sidense's customers and potential customers that Kilopass would soon be filing patent infringement lawsuits and/or an International Trade Commission (ITC) action, for infringement of the '751, '757 and '540 patents. However, Kilopass knew Sidense's memory technology did not infringe those patents.  On information and belief, Kilopass never had the means or serious intention to file the threatened ITC action or any of the threatened lawsuits, and never did so.

73.    To further thwart competition, Kilopass falsely told customers and potential customers that Sidense had informed the district court that it was Sidense's customers, rather than Sidense, who were responsible for infringing Kilopass' patents, and Kilopass used this to dissuade customers from dealing with Sidense and to harm competition.

74.    Kilopass has also falsely told customers and potential customers that Sidense was not financially stable including that Sidense was no longer commercially viable, would soon be bankrupt, and would soon go out of business. In July 2011, Kilopass told a Sidense customer that Sidense was likely to "go bankrupt before next year." Although Kilopass had put Sidense under great financial stress, these statements were untrue. However, they succeeded in chilling Sidense's customers and potential customers from dealing with, and/or further dealing with, Sidense.

75.     Kilopass also commenced a program of offering Sidense customers a "Patent Coverage License" which, for a price, would protect them from being liable for patent infringement when Kilopass would ultimately obtain a damages judgment that it said Sidense would be financially unable to pay. Pursuant to this program, Kilopass propagandized Sidense's customers, who were also Kilopass' future customers, that Sidense was guilty of patent infringement (when Kilopass knew this was untrue) and that the litigation had put Sidense under financial stress (which Kilopass had accomplished by asserting and publicizing its patent infringement claims).

76.     These Kilopass activities have caused customers and potential customers to refrain from doing business and/or further business with Sidense, thereby depriving Sidense of revenues and depriving customers of an alternate source of antifuse memory technology. Moreover, these Kilopass activities have forced Sidense to expend millions of dollars defending and responding to those Kilopass activities, thereby diverting scarce capital away from competing with Kilopass. No other company entered the market while the litigation was pending.

77.     On information and belief, by foreclosing Sidense from the market during the pendency of the lawsuit and thereafter by diminishing Sidense's capital, Kilopass has gained a foothold with customers by virtue of a "lock-in-effect" with customers who have invested in adapting their integrated circuits to the Kilopass technology. Those customers are, therefore, now reluctant to undertake the further cost of switching their integrated circuits from the Kilopass technology to Sidense. This "lock-in-effect" has persisted even after the fear of infringement has subsided and has magnified the harm to competition caused by Kilopass.

78.     As a result, Kilopass has captured dominant market share that will continue into the future and only increase, as Kilopass succeeds in locking more and more customers into the Kilopass technology.



**Relevant Market**

79.     The relevant market is the market for licensing CMOS embeddable antifuse OTP NVM intellectual property to chip designers and chipmakers who incorporate (embed) that technology in integrated circuits manufactured for their own use, or for use by their customers.  Both Kilopass and Sidense are participants and competitors in this market.

80.     On information and belief, Kilopass had at least a 70% share in 2008 in the relevant market, and this share has continued to grow.

81.     A relevant submarket is the market for field programmable CMOS embeddable antifuse OTP NVM IP.

82.     Another relevant submarket is the market for CMOS embeddable antifuse OTP NVM IP at the 40 nm technology node and smaller.

83.     Another relevant submarket is the market for high security CMOS embeddable OTP NVM IP.

84.     Another relevant submarket is the market for CMOS embeddable OTP NVM IP system on chip (SOC) integrated circuits for use and set top boxes.

85.     Another relevant submarket is the market for CMOS embeddable OTP NVM IP SOC integrated circuits for use in smart phones.

86.     Kilopass' dominance in the relevant market, coupled with its violations of the antitrust laws, has given it a dominant position in each of the above submarkets.

**Relevant Geographic Market**

87.     The relevant geographic market is worldwide.

**Harm to Competition**

88.     Kilopass' illegal conduct set forth above has injured competition in at least the following ways:

89.     Kilopass' illegal conduct has prevented companies from entering the relevant market(s) identified above.

90.    On information and belief, no third party entered the markets for CMOS embeddable antifuse NVM OTP IP in competition with Kilopass until one month after the Federal Circuit affirmed Sidense's victory in the lawsuit.

91.    On information and belief, at least one company, eMemory, had investigated entering that market several years earlier, but delayed until after the Federal Circuit found in favor of Sidense.

92.    On information and belief, Kilopass' conduct has also had a chilling effect on innovation in embeddable antifuse NVM OTP IP, and has suppressed the development of new competitive technologies.

93.    Kilopass' conduct alleged herein has harmed competition in the markets for the licensing of CMOS embeddable antifuse NVM OTP IP by reducing Sidense's revenues and increasing its expenses, thereby depriving Sidense of the capital needed to advance its technology as needed to compete with Kilopass as integrated circuit feature sizes grew increasingly smaller with advances in semiconductor processing technology. This has reduced supply and increased price in those markets, depriving those customers of Sidense's second source competition, especially in the 40 nm and smaller technology markets, where Sidense otherwise would have given the customers a competitive second product choice having different features, including a desirably smaller die area, and a competitive price, thereby reducing supply and tending to increase price in those markets.

94.    The effect of Kilopass' conduct has been magnified by inherent barriers to entry in the markets for CMOS embeddable antifuse NVM OTP IP including the extended length of time it takes for a company with embeddable IP technology to demonstrate that its technology is safe from defects that might harm the chips in which it is embedded, or otherwise degrade the manufacturing yield for those chips.

95.    Kilopass' conduct alleged herein has harmed competition in the market for licensing the subject technology by checking customers and potential customers, i.e. chip designers and chipmakers, from doing business with Sidense out of concern



that use of the Sidense technology would cause them and their end user customers to become liable for patent infringement. On information and belief, a "lock-in-effect" has persisted even after the fear of infringement has subsided and has magnified this harm to competition. These factors have reduced supply and increased price by similarly depriving those customers of a second product choice with different features such as a desirably smaller die area and a competitive price, thereby reducing supply and tending to increase price in those market.

96.    The harm to the licensing and technology markets has been most pronounced in reducing the supply of product and tending to raise prices in the 40 nm and smaller technology markets where Sidense has lacked the capital to effectively pursue an offering and no other companies have entered, leaving Kilopass as essentially in control of CMOS embeddable antifuse NVM OTP IP in those markets. This has led to decreased output and higher prices in the relevant market and submarkets.

**Injury to Sidense**

97.    By means of the conduct alleged above, Kilopass has caused customers and potential customers to forego licensing CMOS embeddable antifuse NVM OTP IP from Sidense, thereby reducing Sidense's revenues and causing Sidense to lose profits.

98.    Kilopass' conduct alleged above has lessened the capital Sidense has had available to compete with Sidense, e.g. to advance its technology as integrated circuit technology has steadily evolved to smaller and smaller feature sizes, thereby causing Sidense a loss of profits.

99.    Kilopass' conduct alleged above has also caused Sidense to incur substantial external costs, which it would not have otherwise incurred, including substantial litigation costs paid out to its lawyers and external vendors, and indemnity payments made to reimburse customers for their expenses in responding to Kilopass subpoenas.



100.   Kilopass' conduct alleged above has additionally caused Sidense to incur substantial internal costs which it would not have otherwise incurred, resulting from the time and attention paid by Sidense and its employees to support the litigation, to counteract Kilopass' slanted lawsuit publicity and anti-Sidense propaganda, and to negotiate and administer its license agreements to specifically deal with customer concerns regarding the Kilopass litigation.

101.   Beginning in 2010, Sidense has been forced to divert millions of dollars from its business operations to pay attorneys' fees to defend against Kilopass' exclusionary conduct.

102.   Kilopass' litigation and disinformation campaign has also led actual and potential Sidense customers to elect not to purchase from Sidense.

103.   None of Kilopass' conduct as outlined above is immune from scrutiny under the antitrust laws. Kilopass' disinformation campaign is not protected petitioning activity. And Kilopass' various litigations and administrative proceedings are not immune from antitrust scrutiny because they are baseless shams. In fact, Kilopass brought these cases to prevent Sidense from competing and to harm competition in the market, independent of the outcome of the cases.

## KILOPASS' VIOLATION OF THE FEDERAL ANTITRUST LAWS

104.   Sidense claims four separate bases for violation of the antitrust laws: (1) Kilopass used a sham patent infringement lawsuit, and publicity regarding same, to attempt to monopolize; (2) Kilopass used a sham patent infringement lawsuit, and publicity regarding same, to monopolize; (3) Kilopass used an overall scheme consisting of a sham series of lawsuits and legal proceedings, and threats of same, without regard to legal merit, and publicity regarding same, to attempt to monopolize; and (4) Kilopass used an overall scheme consisting of a sham series of lawsuits and legal proceedings, and threats of same, without regard to legal merit, and publicity regarding same, to monopolize.



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 22 -

# FIRST CLAIM FOR RELIEF

### Attempted Monopolization
### In Violation of Section 2 Of The Sherman Act

105.   Sidense repeats and incorporates by reference the allegations made in paragraphs 1 - 45, 53 - 67 and 70 - 103 above.

106.   By such acts, practices and conduct, Kilopass has unlawfully attempted to monopolize the relevant market or submarkets by means of bringing, prosecuting and publicizing a sham objectively baseless lawsuit for patent infringement, defamation, interference, false advertising and unfair competition, without probable cause and in bad faith intending to interfere directly with Sidense's business relationships through the use of that lawsuit, as opposed to the outcome of that lawsuit, as an anticompetitive weapon.

107.   When Kilopass filed the baseless lawsuit for patent infringement, it had at least 70% market share in the relevant market and sub-markets. As a result, Kilopass' conduct as alleged herein has a dangerous probability of acquiring monopoly power over the relevant market and submarkets.

108.   On information and belief, Kilopass intended to acquire monopoly power in the relevant antifuse markets, and its CEO knew how to use baseless patent infringement litigation to achieve his goal.

109.   Sidense had been Kilopass' only significant competitor in the markets for CMOS embeddable antifuse NVM OTP IP since about 2008. Thus, Kilopass knew that if it could destroy Sidense, it would have a virtual monopoly.

110.   Kilopass sued Sidense for alleged infringement of the '751, '757 and '540 patents.

111.   Because it knew or should have known that Sidense did not infringe its patents, Kilopass' three-year pursuit of its patent infringement lawsuit was baseless. Because the lawsuit was filed purely to burden Sidense to prevent it from competing, and to deter entry and innovation, it was also fundamentally vexatious.



112.   Kilopass also conducted the patent infringement lawsuit in a vexatious manner designed to extend the lawsuit and increase its cost to Sidense.

113.   For example, Kilopass refused to stay the patent litigation pending outcome of reexamination of the '757 and '540 patents which are invalid, and reexamination of the '751 patent which is invalid as broadly construed by Kilopass in trying to make it appear to cover the Sidense memory cell. Had Kilopass acquiesced, Sidense would not have incurred the many millions of dollars of external and internal expense it has suffered, and which it asserts as its damages herein.

114.   In addition, to interfere further and directly in Sidense's customer relationships, Kilopass served extensive and abusive document subpoenas on nearly all of Sidense's many customers for no valid purpose, as evidenced by the fact that Kilopass made no use of the subpoenaed documents in the litigation and listed none of them in its extensive list of trial exhibits.

115.   Also, even though Sidense provided an extensive and detailed interrogatory answer one year before summary judgment in which it explained why Kilopass' theories of literal infringement and infringement by equivalence were hopelessly meritless, rather than dismiss its infringement claim as it should have, Kilopass changed its theory of infringement to vexatiously keep the lawsuit alive for another year – albeit without notifying Sidense or seeking permission from the court, as it was required to do.

116.   Kilopass also vexatiously attempted to extend the lawsuit by improperly disavowing its disclaimer of the '751 patent's coverage of the Tanaka/Sidense row wordline configuration in a frivolous motion for reconsideration.

117.   Thus, by using baseless patent litigation, which it pursued without probable cause, Kilopass has attempted to obtain monopoly power over the relevant markets not through good business skill or acumen or by other procompetitive conduct, but by means of the previously mentioned activities.



## SECOND CLAIM FOR RELIEF

### Monopolization
### In Violation of Section 2 of the Sherman Act

118.   Sidense repeats and incorporates by reference the allegations made in paragraphs 1 - 45, 53 – 67, 70 – 103 and 107 - 116 above.

119.   At all relevant times, Kilopass has had monopoly power in the relevant market.

120.   By such acts, practices and conduct alleged herein, Kilopass has unlawfully monopolized the relevant market or submarkets by means of bringing, prosecuting and publicizing a sham objectively baseless lawsuit for patent infringement, defamation, interference, false advertising and unfair competition, without probable cause and in bad faith intending to interfere directly with Sidense's business relationships through the use of that lawsuit, as opposed to the outcome of that lawsuit, as an anticompetitive weapon.

## THIRD CLAIM FOR RELIEF

### Attempted Monopolization
### In Violation of Section 2 of the Sherman Act

121.   Sidense repeats and incorporates by reference the allegations made in paragraphs 1 – 103 and 107 – 116 above.

122.   By such acts, practices and conduct alleged herein, Kilopass has unlawfully engaged in an overarching anticompetitive scheme against Sidense with the intent of attempting to monopolize the relevant market and submarkets. This scheme included, but was not limited to:

(a)    initiating, vexatiously conducting and publicizing a sham lawsuit for infringement of the '751, '757 and '540 patents as alleged in paragraph ___ above;

(b)    initiating, vexatiously conducting and publicizing sham US PTO proceedings for *inter partes* re-examination of the '855 patent;



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 25 -

(c)     making baseless threats of litigation to Sidense's customers and potential customers, including, but not limited to ITC litigation, U.S. patent litigation, and Japanese patent litigation for alleged infringement of the '751, '757 and '540 patents and a Japanese counterpart to those patents, all with the aim of dissuading those customers from dealing with Sidense.

123.   Kilopass asserted all of these sham actual and threatened lawsuits and legal proceedings, whether with or without probable cause, without regard for their legal merits.

124.   Kilopass' threats of ITC patent litigation were also vexatious because Kilopass knew Sidense did not infringe the asserted patents, and because Kilopass had neither the means nor the intent to actually carry out those threats.

125.   When Kilopass filed the baseless lawsuit for patent infringement, it had at least 70% market share in the relevant market and sub-markets. As a result, Kilopass' conduct as alleged herein has a dangerous probability of acquiring monopoly power over the relevant market and submarkets.

## FOURTH CLAIM FOR RELIEF

### Monopolization
### In Violation of Section 2 of the Sherman Act

126.   Sidense repeats and incorporates by reference the allegations made in paragraphs 1-103 and 107 – 116 above.

127.   At all relevant times, Kilopass has had monopoly power in the relevant market.

128.   By such acts, practices and conduct alleged herein, Kilopass has unlawfully engaged in an overarching anticompetitive scheme against Sidense with the intent of maintaining its monopoly power in the relevant market and submarkets. This scheme included, but was not limited to:

(a)     initiating, vexatiously conducting and publicizing a sham lawsuit for infringement of the '751, '757 and '540 patents;



(b)      initiating, vexatiously conducting and publicizing sham US PTO proceedings for *inter partes* re-examination of the '855 patent;

(c)      making baseless threats of litigation to Sidense's customers and potential customers, including, but not limited to ITC litigation, U.S. patent litigation, and Japanese patent litigation for alleged infringement of the '751, '757 and '540 patents and a Japanese counterpart to those patents, all with the aim of dissuading those customers from dealing with Sidense.

129.    Kilopass asserted all of these sham actual and threatened lawsuits and legal proceedings, whether with or without probable cause, without regard for their legal merits.

130.    Kilopass' threats of ITC patent litigation were also vexatious because Kilopass knew Sidense did not infringe the asserted patents, and because Kilopass had neither the means nor the intent to actually carry out those threats.

## PRAYER FOR RELIEF

WHEREFORE, Sidense asks this Court to enter judgment against Kilopass, its subsidiaries, affiliates, agents, servants, employees, attorneys and all persons in active concert or participation with them, granting it the following relief:

1.      A finding that the actions alleged above are in violation of Section 2 of the Sherman Act.

2.      A finding that Kilopass has engaged in anti-competitive conduct in violation of Section 2 of the Sherman Act.

3.      A judgment in Sidense's favor and against defendant, in an amount, which the evidence will show Sidense has sustained as a result of its being injured in its business and property as a result of defendant's violations of the antitrust laws, including an award of treble damages, all as provided under Section 4 of the Clayton Act (15 U.S.C. § 15).

4.      An injunction against each of the unlawful practices alleged.



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 27 -

1     5.     An award to Sidense of the costs of suit, including its reasonable

2 attorneys' fees.

3     6.     An award of damages pursuant to Section 4 of the Clayton act, for

4 violation of Section 2 of the Sherman Act; and

5     7.     Such other and further relief as this Court and/or a jury may deem

6 proper and just.

7

8

9

DATED:  May 14, 2014          Respectfully submitted,

10
                              KILPATRICK TOWNSEND & STOCKTON
11                            LLP

12

13                            By:     */s/ Roger L. Cook*
                                      ROGER L. COOK
14                                    ROBERT D. TADLOCK

15                            Attorneys for Plaintiff
                              Sidense Corp.
16

17

18

19

20

21

22

23

24

25

26

27

28



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION

1

2 **DEMAND FOR JURY TRIAL**

3         Plaintiff Sidense hereby demands a trial by jury of all issues triable by jury

4 pursuant to Federal Rule of Civil Procedure 38(b) and Civil Local Rule 3-6(a).

5

6 DATED:  May 14, 2014          Respectfully submitted,

7                               KILPATRICK TOWNSEND & STOCKTON
                               LLP

8

9                               By:      */s/ Roger L. Cook*

10                                  ROGER L. COOK
                                   ROBERT D. TADLOCK

11                              Attorneys for Plaintiff

12                              Sidense Corp.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



COMPLAINT FOR MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION          - 29 -